Stephanie Struble CO #34598 (Pro Hac Vice) (email: Stephanie.Struble@eeoc.gov
William Moench MO # 34420 (Pro Hac Vice) (email: William.Moench@eeoc.gov)
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Denver Field Office
303 E. 17th Avenue, Suite 410
Denver, Colorado 80203
Telephone: (303) 866-1381

Attorneys for Plaintiff EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

|  |  |
|---|---|
| EQUAL EMPLOYMENT<br>OPPORTUNITY COMMISSION,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>LEHI ROLLER MILLS CO., INC.,<br><br>　　　　Defendant. | Civil Action No. 2:08-cv-00591 TC<br><br>**PLAINTIFF EEOC'S RESPONSE<br>IN OPPOSITION TO<br>DEFENDANT'S MOTION FOR<br>SUMMARY JUDGMENT**<br><br>HONORABLE TENA CAMPBELL<br>UNITED STATES DISTRICT<br>JUDGE |

　　　　Plaintiff, Equal Employment Opportunity Commission ("EEOC"), through its legal

counsel responds to Defendant Lehi Roller Mills Co., Inc.'s motion for summary judgment.  This

case involves three claims:  that Mr. Breece was illegally suspended and terminated because of

his age; that Mr. Breece was suspended and terminated because of his disability, diabetes; and

that Defendant improperly inquired about Mr. Breece's diabetes in violation of the Americans

with Disabilities Act.  The facts in this case demonstrate that is not an appropriate case for

summary judgment.  First, there is significant direct evidence of discrimination, including

statements that Mr. Breece was "getting old," that Defendant wanted to implement ideas from

younger employees, and admissions by Defendant's President and Owner that he had concerns

about Mr. Breece's health, which were expressed while relieving Mr. Breece from his duties.  In addition to the direct evidence of discriminatory motive, there are also numerous issues of material fact regarding each element of the prima facie case for each of the claims in this case. Finally, Plaintiff has presented significant evidence of pretext, including numerous inconsistencies in Defendant's explanations for Mr. Breece's termination, making summary judgment inappropriate in this case.

## I. INTRODUCTION

Alan Breece began working at Lehi Roller Mills in 1980.  He worked his way up from Miller to Plant Manager.  Throughout his employment, he was an excellent employee.  During his employment, he was diagnosed with diabetes.  While Mr. Breece's diabetes was originally well controlled, it progressed to the point where he was required to give himself insulin up to four times each day.  In early 2003, the President and owner of Lehi Roller Mills began questioning Mr. Breece about his diabetes.  Mr. Robinson made Mr. Breece meet with him every Tuesday to discuss his diabetes, including inquiring about his blood sugar levels the prior week and asking if he had exercised.

In March 2003, Mr. Robinson and Mr. Jensen, the Vice-President of Sales, met with Mr. Breece and placed him on administrative leave.  During the meeting, Mr. Robinson told Mr. Breece (who was 49 years old) that he was getting older and had diabetes, that Robinson and Jenson were concerned that Mr. Breece's diabetes was affecting his work, and that Mr. Robinson had some younger guys with new ideas that he wanted to put in charge.  Mr. Robinson further urged Mr. Breece to take care of his health during his leave of absence.  During Mr. Breece's absence, Mr. Tim Tucker, a younger individual who does not have diabetes, took over for Mr.

Breece.  In June 2003, Mr. Breece returned to Lehi Roller Mills and met with Mr. Robinson.  Mr. Robinson informed him that he was being terminated.

Defendant contends that it placed Mr. Breece on a leave of absence because the mill was not meeting its production targets.  Defendant contends that Mr. Breece was not obtaining a high enough extraction rate (yield) and that he was not running enough wheat through the mill (throughput).  Mr. Breece tried to implement many changes to increase the yield, but was unable to do so.  He informed Mr. Robinson that the higher yields could not be obtained with the wheat that the mill was purchasing and the wheat contained less flour due to the ongoing drought.  Defendant admits that drought conditions can affect the quality of the wheat.  Indeed, Defendant states that it placed Mr. Breece on leave in March 2003, rather than terminating him, so that it could determine if Mr. Tucker, who was employed as Mr. Breece's subordinate, would be able to obtain the higher yields.

During the EEOC's investigation into Mr. Breece's charge of discrimination, Defendant stated that within one week of Mr. Tucker taking over for Mr. Breece, the mill returned to its historic levels and therefore Mr. Breece was terminated.   The evidence obtained during discovery reveals, however, that Defendant's stated reasons for terminating Mr. Breece are unworthy of belief.  First, Defendant's current Mill Superintendent testified that the standards given to Mr. Breece and that he was terminated for failing to meet, were impossible to meet.  Indeed, the evidence reveals that the new Superintendent has not met the standards to which Mr. Breece was held.  Second, several of Defendant's managers admitted in their depositions that Mr. Tucker did not turn the mill around after Mr. Breece left, and Mr. Breece's subordinates, the millers at the mill, likewise testified that nothing changed at the mill after Mr. Breece left.

Likewise, even after Mr. Tucker left and a new Mill Superintendent arrived, not only did the yield did not improve, the throughput has declined significantly.

Because Defendant made direct statements that Mr. Breece was relieved of his duties due to concern about his health, and that Mr. Breece was let go so that a younger management team could run the mill, summary judgment is inappropriate in this case. Even without this direct evidence, however, there is significant evidence of pretext, which likewise precludes summary judgment in this case.

## II. MATERIAL DISPUTED AND UNDISPUTED FACTS

The following numbered facts by Defendant are not disputed by Plaintiff for purposes of this motion: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 18, 20, 23, 25, 26, 29, 30, 31, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 49, 50, 54, 55, 56, 57, 58, and 59.

**The following are the material disputed facts in the case**: [1]

1.  Throughout his employment, Mr. Breece was an excellent employee. The Millers who worked under him all testified that Mr. Breece was an excellent boss. [Exhibit 31 (Palomino Dep. at 13:14-14:6); Exhibit 30 (Ortega Dep. at 18:14-16) (describing Mr. Breece as a "real special" boss)].

2.  Mr. Breece was never disciplined during his employment. Indeed, he has a pristine personnel file, which is devoid of any discipline or criticisms. [Exhibit 1; Declaration of Stephanie Struble at ¶ 10].

3.  Mr. Breece enjoyed working at the Mill and was very dedicated to his job. Indeed, his daughter described how Mr. Breece took pride in his work and even stated that the mill was her father's first love. [Exhibit 33 (Smith Dep. at 111:16-112:1)].

---

[1] For purposes of clarity and background, Plaintiff has included a few facts that Plaintiff does not believe are disputed. In addition, Plaintiff has also included relevant factual admissions that were omitted from Defendant's Statement of Facts.

4.   Mr. Robinson was the owner and President of Lehi Roller Mills, Inc.  [undisputed].

5.   Defendant admits that for more than twenty years, until sometime in 2002 Mr. Breece was an "outstanding" employee.  [Exhibit 32 (Robinson Dep. at 42:18-22)].

6.   In 2003, Mr. Robinson began regularly inquiring as to Mr. Breece's health. [Exhibit 25 (Breece Dep. at 219:24-220:21; 221:12-20)]. [disputes D's SOF # 28].

7.   Mr. Breece has diabetes.  [Exhibit 25(Breece Dep. at 80:12-20)].  [undisputed].

8.   Mr. Breece is disabled as his diabetes substantially affects his major life activity of eating. [Exhibit 22; Exhibit 33 (Smith Dep. at 120:14-22)].  [undisputed].

9.   From when he was diagnosed in 1995, Mr. Breece's diabetes worsened.  [Exhibit 25 (Breece Dep. at 323:12-14)].

10.   Mr. Todd Berry, who is part of the management team responsible for the decision to put Mr. Breece on leave, testified that Mr. Breece's diabetes worsened the two years prior to his termination.  [Exhibit 24(Berry Dep. at 80:10-16)].

11.   At the time of his termination, Mr. Breece had to take insulin approximately four times a day.  [Exhibit 22 at p.2].

12.   Beginning in January 2003, Mr. Robinson required Mr. Breece to meet with him on a weekly basis to discuss Breece's diabetes.  During these meetings, Mr. Robinson asked Mr. Breece about his diabetes, including but not limited to how his blood sugar levels had been for the previous week, whether he was exercising, whether he had been eating well, and whether he had consumed any alcohol the previous week. [Exhibit 25 (Breece Dep. at 219:20-221:20; 237:11-19); Exhibit 32 (Robinson Dep. at 143:5-24)]. [Disputes D's SOF # 28].

13.     Mr. Robinson often criticized Mr. Breece regarding his sugar levels and for failing to exercise enough.  [Exhibit 25 (Breece Dep. 234:25-235:19)]. [Disputes D's SOF # 28].

14.     Other employees at the facility heard Mr. Robinson ask Mr. Breece about his diabetes and his blood sugar levels.  [Exhibit 33 (Smith Dep. at 81:15-25; 99:19-22)].

15.     Mr. Robinson admits that he asked Mr. Breece if he had been exercising because he knew that it would help lower his blood sugar and would be beneficial to his diabetes. [Exhibit 32 (Robinson dep. at 143:16-24)].

16.     Mr. Breece did not appreciate the constant inquiring of his health status and found it irritating.  [Exhibit 33 (Smith Dep. at 82:14-23); Exhibit 25 (Breece Dep. at 235:20-23)].  [Disputes D's SOF # 28].

17.     Mr. Breece's daughter, Tayna Smith, also worked at Lehi, as the company's secretary. [Exhibit 32 (Robinson Dep. at 148:22-23)] [undisputed].

18.     Mr. Robinson regularly asked Mr. Breece's daughter about Mr. Breece's blood sugar levels, whether he had been exercising or otherwise taking care of himself. [Exhibit 33 (Smith Dep. at 119:14-24)].

19.     In the last quarter of 2002, Lehi Roller Mills increased the requirements for yield to a 74% extraction rate, while requiring a minimum throughput of 3800 pounds per hour. [Def's SOF # 42; Exhibit 2].

20.     Defendant's current Plant Manager, Howard "Bud" Brown, testified that these requirements were impossible to meet with the equipment available at the Mill. [Exhibit 26 (Brown Dep. 111:20-112:13)].

21.    Indeed, these requirements were particularly impossible to meet in 2002 and early

2003, due to a drought. [Exhibit 25 (Breece Dep. at 164:15-23)].

22.    Mr. Breece repeatedly told Mr. Robinson that it was not possible to meet his

increased yield requirements with the wheat that the mill was purchasing. [Exhibit 32

(Robinson Dep. at 58:6-9)].

23.    During discovery, Mr. Robinson admitted that the yield can be affected by drought

and may have been so affected in March 2003.  [Exhibit 32 (Robinson Dep. at  58:19-

59:4)].

24.    Currently, the yield requirement at the Mill is back down to 72%.  [Exhibit 32

(Robinson Dep. at 149:19-21); Exhibit 29 (Knight Dep. at 59:3-4)].

25.    Although Mr. Breece was required to meet a minimum throughput of 3800 cwt/hr,

there is no longer any requirement of a minimum throughput.  [Exhibit 29 (Knight

Dep. at 68:15-19)].

26.    In February 2003, when Breece was the Plant Manager, the mill exceeded 72% yield

at least for part of the month, and in March 2003, the mill obtained a 72% yield

extraction rate.  [Exhibit 2, at p. 2; Exhibit 3]. [Disputes D's SOF # 46, 48].

27.    At a meeting on March 28, 2003, Mr. Robinson told Mr. Breece he was being placed

on paid administrative leave.  [undisputed].  [Dispute's D's SOF # 22].

28.    The meeting on March 28, 2003, was also attended by Cory Jensen, the Vice

President of Sales.  [Exhibit 5] [undisputed].

29.    Mr. Breece was 49 years of age at the time of this meeting. [Exhibit 25 (Breece Dep.

at 18:12-13)].  [undisputed].

30.    At the March 28, 2003 meeting, Mr. Robinson told Mr. Breece that he was getting older and had diabetes, that Robinson and Jensen were concerned Breece's diabetes affected his work, and that Mr. Robinson had some younger guys with new ideas. [Exhibit 4; Exhibit 25 (Breece Dep. 180:2-18; 207:12-18)]. [Disputes D's SOF # 22].

31.    Defendant admits that during the meeting on March 28, 2003, Mr. Robinson expressed concern about Mr. Breece's health and urged him to take care of his health during his leave of absence. [Exhibit 5; Exhibit 27 (Hutchings Dep. at 65:23-66:6); Exhibit 32 (Robinson Dep. at 141:10-142:18)].

32.    On March 28, 2003, after the meeting with Mr. Breece, Mr. Robinson and Mr. Jensen met with Mr. Breece's daughter, Tanya Smith.  [Exhibit 33 (Smith Dep. at 72:18-73:11)].

33.    Mr. Robinson told Ms. Smith that Mr. Breece had been placed on leave and explained that Mr. Breece's "health is not the way it used to be and he's not as young."  [Exhibit 33 (Smith Dep. at 76:3-11)].

34.    Tim Tucker, who was employed as the Head Miller at Lehi Roller Mills, took over Mr. Breece's duties when he was placed on leave.  [Exhibit 24 (Berry Dep. at 47:16-19); Exhibit 30 (Ortega Dep. at 21:12-22); Exhibit 31 (Palomino Dep. at 17:17-18:4); Exhibit 34 (Spafford Dep. at 151:10-12)].

35.    Tucker, who was 41 years old, did not have diabetes.  [Exhibit 35 (Tucker Dep. at 99:20-22; 100:13-19)].

36.    Mr. Tucker, who was involved in the decision to place Mr. Breece on leave, stated that one of the reasons Breece was let go was due to his health issues.  [Exhibit 35 (Tucker Dep. 15:10-17; 18:21-24)].

37.     Mr. Robinson further urged Ms. Smith to stay to be "part of the younger generation" that they then had at the facility.  [Exhibit 33 (Smith Dep. at 73:12-74:8)].

38.     Mr. Brock Knight, the Chief Operations Officer at Lehi Roller Mills, when discussing the termination of Mr. Breece with Mr. Tucker, stated that Lehi Roller Mills wanted to bring in a new younger management team.  [Exhibit 35 (Tucker Dep. at 119:3-12)].

39.     Mr. Knight was involved in the decision to place Mr. Breece on leave.  [Exhibit 24 (Berry Dep. at 43:25-44:10)].

40.     Three months later, in June 2003, Mr. Breece returned to the Mill and was told that he was terminated.  [Exhibit 25 (Breece Dep. 187:12-24)]. [Disputes D's SOF # 28].

41.     When Mr. Breece was placed on leave on March 28, 2003, Tim Tucker took over running the mill.  [Exhibit 35 (Tucker Dep. at 58:20-25; 88:9-15); Exhibit 34 (Spafford Dep. at 97:22-24; 151:10-12); Exhibit 28 (Jensen Dep. at 40:25-41:4)]. [disputes D's SOF # 13, 14].

42.     In January 2003, two months before Breece was placed on leave, Mr. Robinson asked Mr. Tucker if he would be willing to take over Mr. Breece's responsibilities so that they could "make the change."  [Exhibit 35 (Tucker Dep. at 92:18-21)]. [disputed D's SOF # 17].

43.     Once Mr. Breece was relieved of his duties, Mr. Tucker was promoted to the position of Milling Superintendent.  [Exhibits 6 and 7].  [Disputes D's SOF # 15, 16, 17].

44.     The position titles of "Mill Superintendent" and "Plant Manager" are used interchangeably at Lehi.  *See, e.g*., [Exhibit 29 (Knight dep. at 8:12-22) (referring to Mr. Breece as Milling Superintendent); Exhibit 35 (Tucker Dep. at 15:7-9) (same);

Exhibit 24 (Berry Dep. at 14:8) (referring to Mr. Breece as the "production

manager/mill superintendent")].  [Dispute's D's SOF # 17].

45.    When Mr. Tucker was promoted to Milling Superintendent, he was provided with

incentive pay and was paid a "sizable" bonus.  [Exhibit 35 (Tucker Dep. at 73:6-22);

Exhibit 6].  [Disputes D's SOF #15 and 16].

46.    Mr. Tucker testified that he took over at least 90% of Mr. Breece's duties and could

not remember a single job responsibility performed by Mr. Breece that he did not

perform.  [Exhibit 35 (Tucker Dep. at 105:22-106:12)]. [disputes D's SOF # 14]

47.    Mr. Tucker was never told that he was only temporarily taking over the position.

[Exhibit 35 (Tucker Dep. 106:13-107:4)]. [disputes D's SOF # 16, 17].

48.    After Mr. Tucker took over, there were no changes made to the mill. [Exhibit 31

(Palomino Dep. at 18:8-11)].

49.    During Mr. Tucker's tenure as Milling Superintendent, the mill did not obtain higher

yields than it had under Mr. Breece.  [Exhibit 24 (Berry Dep. at 61:21-25; 69:20-

70:11); Exhibit 26 (Brown Dep. at 87:8-88:4)].

50.    During Mr. Tucker's tenure as Milling Superintendent, the mill continued to lose

money.  [Exhibit 24 (Berry Dep. at 70:12-14)].

51.    In 2003, during Mr. Tucker's tenure as Milling Superintendent, the mill lost a

significant amount of money.  Indeed, in 2002, under Mr. Breece, the mill had made a

net profit (prior to minority interest), while in 2003, the Mill lost over $800,000 (prior

to minority interest).  [Exhibit  8 at p. 4],

52.     On October 24, 2003, Mr. Tucker had an altercation with Mr. Robinson over Tucker's rate of pay, leading him to quit his employment.  [Exhibit 35 (Tucker Dep. 65:4-6); Exhibit 32 (Robinson Dep. 150:6-18)].

53.     During the entire time Mr. Tucker was running the Mill, from March 2003 through October 2003, Defendant did not post any notice of an opening for Milling Superintendent or Plant Manager, or otherwise advertise that there was such an opening.  [Exhibit 23 (30b6 Dep. at 142:5-11); Exhibit 29 (Knight Dep. at 79:2-8)]. [Disputes D's SOF # 19].

54.     It was only after Mr. Tucker and Mr. Robinson had the altercation regarding Mr. Tucker's pay that any effort was made to hire a new Plant Manager.  [Exhibit 29 (Knight Dep. at 38:9-14)]. [Disputes D's SOF # 19, 21, 22, 52].

55.     In late October, Mr. Robinson called Howard "Bud" Brown, who had previously worked at Lehi Roller Mills, and asked him to return and assume the role of Mill Superintendent.  [Exhibit 26 (Brown Dep. at 16:2-10)].

56.     Mr. Brown was re-hired at Lehi Roller Mills in December 2003, in the position of Milling Superintendent. [Exhibit 9 and Exhibit 10].

57.     Contrary to Defendant's allegations in its summary judgment brief, Mr. Brown has not met any 74% yield requirement, and often does not meet the 72% yield requirement.  [Exhibit 11]. [Disputes D's SOF # 51].

58.     The yields obtained at Lehi since Mr. Brown took over are no different than the yields obtained under Mr. Breece.  [Exhibit 31 (Palomino Dep. at 22:14-16)]. [Disputes D's SOF # 51].

**The following of Defendant's asserted undisputed facts are partially disputed by Plaintiff**:

21.  "Brown was born on November 7, 1945. (Brown Depo., 5:4-5.) Brown was therefore 58 years old (nine years older than Breece) when he was hired to replace Breece. (Brown Depo., 130:11-14.)"  Plaintiff disputes this fact only to the extent that it states that Mr. Brown was hired to replace Mr. Breece.  EEOC contends that Mr. Breece was initially replaced by Mr. Tucker, who was replaced by Mr. Brown.  Mr. Tucker held the position for seven months, during which time the position was never treated as a vacant position being temporarily filled.  Brown was not hired until after Mr. Tucker resigned, and thus he replaced Mr. Tucker, not Mr. Breece. [See facts #s 40-43 above].

22.  "Brown, the individual hired by Lehi Roller Mills to replace Breece, is not only nine years older than Breece, but he also has diabetes. (Brown Depo., 114:3-4.) Management at Lehi Roller Mills was aware that Brown has diabetes. (Brown Depo., 114:22-115:5; 115:9-25.)" EEOC does not dispute that Mr. Brown has diabetes or that he is nine years older than Mr. Breece.  EEOC disputes that Mr. Brown was hired to replace Mr. Breece, rather than Mr. Tucker. [See facts #s 40-43 above].  EEOC also disputes that Lehi was aware that Mr. Brown had diabetes when it made the decision to hire Mr. Brown.  [Exhibit 26 (Brown Dep. at 134:9-15)]. Indeed, it would have been illegal for Defendant to inquire about his health status at the time he was offered the job.  42 U.S.C. §12112(d)(2)(A).  Further, Mr. Brown testified that he never told Mr. Robinson that he had problems with his diabetes.  [Exhibit 26 (Brown Dep. at 134:13-15)].

27.  "Breece never requested any accommodation. Nonetheless, throughout his employment at Lehi Roller Mills, Breece was allowed whatever accommodation was necessary to take care of his diabetes. (Breece Depo., 87:18-25; 111:19-112:8.)."  Plaintiff disputes that Mr.

Breece never asked for an accommodation.  [Exhibit 25 (Breece Dep. at 105:22-106:2)].  Mr. Breece testified that he asked to be able to take a break to monitor his sugar levels and take insulin.  *Id*.

28.  "Breece did not feel he was penalized at Lehi Roller Mills because of his diabetes. (Breece Depo., 84:8-12.)"  EEOC does not dispute, as he testified in his deposition, that Mr. Breece did not believe he was penalized at Lehi Roller Mills when he first disclosed that he had diabetes.  Indeed, as he testified, his diabetes was more controlled then.  [Exhibit 25 (Breece Dep. 84:13-85-3)].  Mr. Breece's diabetes, however, progressed and worsened over time.  [Exhibit 25 (Breece Dep. at 323:12-14); Exhibit 24 (Berry Dep. at 80:10-16)].  In 2003, Mr. Robinson began regularly inquiring as to the specifics of Mr. Breece's diabetes and then suspended and terminated him due to his diabetes.  [Exhibit 25 (Breece Dep. at 219:24-220:21; 221:12-20; 241:8-12)].  When these events happened, Breece felt he was being penalized because of his diabetes.  [Exhibit 25 (Breece Dep. at 280:20-282:25)].

32.  "As mentioned above, Breece's replacement, Brown, has diabetes. (Brown Depo., 114:3-4.)"  EEOC disputes that Mr. Brown was hired to replace Mr. Breece rather than Mr. Tucker. [See facts #s 40-43 above].  Further, while Mr. Brown has diabetes, his diabetes is controlled and Mr. Brown testified that he is not disabled.  [Exhibit 24 (Berry Dep. at 87:10-12); Exhibit 26 (Brown Dep. at 134:22-135:4)].  Mr. Breece's diabetes, on the other hand is not controlled and was not controlled at the time of his termination.  Mr. Breece was taking insulin four times per day in 2003.  [Exhibit 22 at p. 2].  Mr. Brown, on the other hand, testified that he only takes insulin in extraordinary circumstances, such as when he has to have surgery.  [Exhibit 26 (Brown Dep. at 114:15-17)].  Further, Mr. Brown testified that he does not have any problems related to his diabetes.  [Exhibit 26 (Brown Dep. at 134:13-15)].

47. "Breece felt urgency to meet stated production targets. (Breece Depo., 173:22-174:2.) He knew that unless the extraction / yield rates improved, Lehi Roller Mills would have difficulty surviving, and that one of the consequences might be that people at Lehi Roller Mills—including himself—would lose their jobs. (Breece Depo., 158:9-19; 177:5-22.)."  EEOC does not dispute that Mr. Breece felt urgency to improve the performance of the mill.  Plaintiff denies that Mr. Breece knew that one of the consequences might be that people, including himself, would lose their jobs.  Defendant's citation does not support this allegation.

60. "Shortly after his employment with Lehi Roller Mills ended, Breece filed a claim for unemployment. (Breece Depo., 264:11-16.) When Breece filled out his unemployment claim, he stated that he had been "reduced in force," and made no mention of any termination by reason of discrimination based on "age or disability." (*Id.*)"  Mr. Breece did not file a claim for unemployment.  [Exhibit 25 (Breece Dep. at 262:3-6)].

**The following of Defendant's facts are not technically disputed but are irrelevant for purposes of this motion:**

24. "Breece—by his own acknowledgment—is unable to square Lehi Roller Mills' hiring of Brown, who is also diabetic, with his theory (and apparently that of EEOC) that Lehi Roller Mills terminated Breece based on his diabetes. (Breece Depo., 269:4-17.)"   While EEOC does not dispute that Mr. Breece made this statement in his deposition, this is irrelevant to the question of whether Defendant discriminated against Mr. Breece.  Moreover, this response is to an objectionable question, which improperly calls for a legal conclusion. Finally, Mr. Breece is not privy to, and was not at the time of his deposition, to the significant evidence of pretext in this case.  Mr. Breece is not aware of what happened at the mill after he left, nor is he aware of the fact that Mr. Brown's diabetes is insignificant.  Moreover, due to the protective order entered

in this case (which was objected to by the EEOC), the EEOC was prevented from sharing with Mr. Breece significant evidence in this case.  [Dkt. 62 at ¶ 4.2].

33. "Breece acknowledges that Robinson has no discriminatory animus against persons with diabetes. (Breece Depo., 271:20-22.)."  As a legal matter, discriminatory animus may be inferred from certain facts.  *See, e.g. Valentine v. American Home Shield Corp.,* 939 F.Supp. 1376, 1401-1402 (N.D. Iowa, 1996) ("Bad faith in the interactive process necessarily suggests a desire not to accommodate an employee's disability, or, to put it another way, suggests discriminatory animus.")  Mr. Breece is not schooled on all the facts and circumstances which might support a finding of discriminatory animus; his personal layman's view as to Robinson's lack of discriminatory animus is irrelevant.  Discriminatory animus is for the jury to determine, after proper instruction on the law.

53. "Breece is unable to square Lehi Roller Mills' hiring of Brown, who is nine years older than Breece and also diabetic, with his theory that Lehi Roller Mills terminated him based on his age or diabetes. (Breece Depo., 269:4-17.)"  While EEOC does not dispute that Mr. Breece made this statement in his deposition, this is irrelevant to the question of whether Defendant discriminated against Mr. Breece.  Mr. Breece, as a lay person, is not obligated to understand legal theory.

56. "Lehi Roller Mills has no policy against hiring or retaining persons based on their age. (Breece Depo., 96:4-7.)"  EEOC does not dispute that Defendant has no affirmative written policy that it will unlawfully discriminate against people based on age, in direct contravention to the prohibitions of the Age Discrimination in Employment Act.  The lack of any such expressly discriminatory policy, however, has no bearing on the question of whether Mr. Breece was placed on leave and terminated because of his age.

57. "Breece does not believe that Robinson has any animus against persons who are over the age of 40. (Breece Depo., 271:23-25.).  As a legal matter, discriminatory animus may be inferred from certain facts.  *See, e.g. Valentine v. American Home Shield Corp.,* 939 F.Supp. 1376, 1401-1402 (N.D.Iowa, 1996) ("Bad faith in the interactive process necessarily suggests a desire not to accommodate an employee's disability, or, to put it another way, suggests discriminatory animus.")  Mr. Breece is not schooled on all the facts and circumstances which might support a finding of discriminatory animus; his personal layman's view as to Robinson's lack of discriminatory animus is irrelevant.  Discriminatory animus is for the jury to determine, after proper instruction on the law.

## IV.    ARGUMENT

### A.  Summary Judgment Standard

A motion for summary judgment may be granted only where there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law.  F.R.Civ.P. 56. *Anderson Liberty Lobby, Inc.*, 477 U.S. 242, 249-250 (1986); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).   In applying the summary judgment standard, the Court must view the evidence in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255. The nonmovant's evidence is to be believed, and all justifiable inferences are to be drawn in its favor.  *Id.*   All doubts should be resolved in favor of the presence of triable fact issues. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985), *cert. denied*, 474 U.S. 823 (1985).  Moreover, this Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).   Thus, where a defendant relies on testimony of its own interested witnesses, the Court must disregard that evidence because the jury is not required to believe those witnesses. *Id.*   This is particularly true where, as is the case here, the credibility of Defendant's witnesses is inherently suspect.   For example, Mr. Robinson has changed his position on the fundamental question of whether Mr. Breece was terminated or quit.   [compare Exhibit 12 (position statement) with Dkt. 77 - Robinson Dec. at ¶ 25].

### B.  There is a Genuine Issue of Fact Regarding Whether Mr. Breece was Discriminated Against Because of his Age.

Defendant moves for summary judgment on the EEOC's claim that Mr. Breece was placed on leave and then terminated due to his age arguing that the EEOC cannot state a prima facie case of age discrimination because Mr. Breece was ultimately replaced by an individual older than himself and that it has a legitimate nondiscriminatory reason for its actions.  As explained

below, the EEOC does not have to prove a prima facie case of age discrimination because there is direct evidence of age discrimination.  Regardless, however, the EEOC can state a prima facie case of age discrimination and has provided ample evidence of pretext preventing summary judgment in this case.

### 1.        There is Direct Evidence of Age Discrimination

To prevail on an ADEA claim, a plaintiff must establish that age was a determining factor in the employer's challenged decision. *Jones v. Oklahoma City Public Schools*, 617 F.3d 1273, 1277-78 (10th Cir. 2010). The Plaintiff can meet its burden to establish age discrimination by either of two methods – either by presenting direct or circumstantial evidence that age was a determining factor in his termination ***or*** by relying on the prima facie case method established in *McDonnell Douglas*.  *Greene v. Safeway Stores, Inc*., 98  F.3d 554, 559 (10th Cir. 1996).  Where there is direct evidence of discriminatory intent, the Court need not engage in the pretext analysis. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination"). Rather, the Court must merely analyze the direct evidence and determine if it is sufficient to survive summary judgment.  *Fischer v. Forestwood Co., Inc*., 525 F.3d 972 (10th Cir. 2008) (reversing District Court's grant of summary judgment finding sufficient direct evidence to create material issue of fact regarding whether employee was refused employment due to discriminatory motives).

Here, there is direct evidence that age was a determining factor in Mr. Breece's termination.  On March 28, 2003, in the meeting where Breece was relieved of his duties and sent home, R. Sherman Robinson, owner and President of Lehi Roller Mills, explained that Breece was "getting old," and that the company wanted to implement new ideas from younger

employees. [Exhibit 4; Exhibit 25 (Breece Dep. 180:2-18; 207:12-18)].  After this meeting, Mr. Robinson told Mr. Breece's daughter that Mr. Breece had been placed on leave, explaining that Mr. Breece was "not as young as he used to be".  Mr. Robinson then urged Ms. Smith (who was 27 years old at the time) to stay to be "part of the younger generation" that they now had at the facility.  [Exhibit 33 (Smith Dep. at 3:21-22; 73:12-74:8)].  Similarly, Mr. Brock Knight, the Chief Operations Officer at Lehi Roller Mills, when discussing the termination of Mr. Breece with Mr. Tucker, stated that Lehi Roller Mills wanted to bring in a new younger management team.  [Exhibit 35 (Tucker Dep. at 119:3-12)].  Mr. Knight was directly involved in the decision to terminate Mr. Breece.  [Exhibit 24 (Berry Dep. at 43:25-44:10)].  Based on this evidence, a jury could reasonably believe that Mr. Breece's age (49) was a determining factor in Lehi Roller's decision to terminate Mr. Breece.

Defendant, relying solely on out-of-Circuit authority, argues that the comments made by the President of the Company during the meeting to relieve Mr. Breece of his duties, are merely "stray remarks."  Defendant is mistaken.  The Tenth Circuit has explained that where the plaintiff can demonstrate a causal nexus between the comments and the company's decision to terminate the plaintiff, the comments are direct evidence of discrimination and not "stray remarks." *Minshall v. McGraw Hill Broadcasting Co., Inc.*, 323 F.3d 1273, 1281 (10th Cir. 2003) *quoting Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1457 (10th Cir. 1994).  In order to show discriminatory animus based on discriminatory statements, plaintiff must show (1) that a decision-maker made the statements and (2) a nexus between the statements and adverse employment action. *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998).  Here, the comments were made by two decisionmakers – Robinson, the owner and President, and Knight, the COO.  Thus the first element is met.  The nexus is established because the

statements were all made the same day Breece was relieved of his duties, and were made for purposes of explaining to Breece and others why he was relieved of his duties – because he was "getting old" "not as young as he used to be" and to bring in a new "younger management team."

Thus, these discriminatory comments by decision-makers are not merely "stray remarks" as Defendant claims. Rather, they are direct evidence of discriminatory motive and sufficient alone to raise a fact issue for trial as to whether age was a determinative factor in the employment decisions in this case.[2]

### 2.  EEOC Can State a Prima Facie Case of Age Discrimination

To prove age discrimination through circumstantial evidence, a plaintiff must first establish a prima facie case by showing the following: (1) he is within the protected age group; (2) he was doing satisfactory work; (3) he was discharged; and (4) he was replaced by a younger person.[3] *Rivera v. City & Cty. of Denver*, 365 F.3d 912, 920 (10th Cir. 2004). Defendant only challenges the fourth element.

### a.  There is a Question of Fact Regarding who Replaced Mr. Breece

Defendant urges this Court to dismiss Plaintiff's age discrimination claim on the theory that Mr. Breece was "permanently" replaced by an older individual – Bud Brown -- thus defeating the fourth prong of the prima facie case. There is no dispute, however, that when Mr. Breece was terminated, a much younger employee, Tim Tucker (age 41), became Milling Superintendent, and held that position until he resigned in October 2003. It is also undisputed that Mr. Brown was not hired until after Tucker had resigned, and that Brown was hired into the

---

[2] Because the EEOC has provided direct evidence of discrimination, the age of Mr. Breece's replacement is irrelevant. *Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 562 (10th Cir. 1996).
[3] In *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (1996), the Supreme Court held that a plaintiff does not have to prove that he was replaced by someone outside the protected class (*i.e.*, less than 40 years old) to establish the fourth element of the McDonnell Douglas prima facie case in an age discrimination case. 116 S. Ct. 1307 ("The fact that one person in the protected class has lost out to another person in the protected class is ... irrelevant, so long as he has lost out because of his age").

same "Milling Superintendent" position which Tucker had recently vacated.  This evidence is sufficient for a jury to find that Breece was replaced by the younger employee, Tucker, and that Brown actually replaced Tucker, not Breece.

While Defendant argues that Mr. Tucker was never promoted and only temporarily assumed some of Mr. Breece's duties, there is substantial contrary evidence.  First, both Defendant's President and Owner, Mr. Robinson, and Defendant's Vice-President of Sales, Mr. Jensen, testified that Mr. Tucker assumed all of Mr. Breece's duties when he was placed on leave. [Exhibit 32 (Robinson Dep. at 81:5-7); Exhibit 28 (Jensen Dep. at 40:25-41:4)].   Second, Defendant affirmatively asserted both to the Utah Labor Division and to the Utah Department of Workforce Services that Mr. Tucker was "promoted" to Mill Superintendent prior to his leaving Lehi Roller Mills.  [Exhibits 6 and 7].[4]  This evidence is contrary to the company's Chief Operations Officer who testified that Tucker was not promoted.  [Exhibit 29 (Knight Dep. at 37:9-11)].  In addition, after Mr. Breece was terminated, Tucker was given incentive pay and was paid a "sizable" bonus, which further supports that he was indeed promoted and further contradicts Defendant's contentions, including that he was not given a raise.  [Exhibit 35 (Tucker Dep. at 73:6-22); Exhibit 6].

Third, five different witness employed in the mill at the time – three millers, a manager, and Mr. Tucker himself – all testified that Mr. Tucker took over for Mr. Breece when he was relieved of his duties. [Exhibit 24 (Berry Dep. at 47:16-19); Exhibit 30 (Ortega Dep. at 21:12-22); Exhibit 31 (Palomino Dep. at 17:17-18:4); Exhibit 34 (Spafford Dep. at 151:10-12)].

---

[4] Plaintiff expects that Defendant will argue that the positions of "Mill Superintendent" and "Plant Manager" are distinct.  The evidence, however, shows that these titles are used interchangeably at Lehi. *See, e.g.*, Exhibit 29 (Knight dep. at 8:12-22) (referring to Mr. Breece as Milling Superintendent); Exhibit 35 (Tucker Dep. at 15:7-9) (same); Exhibit 24 (Berry Dep. at 14:8) (referring to Mr. Breece as the "production manager/mill superintendent").  Moreover, the evidence shows that Mr. Brown likewise held the position of Milling Superintendent.  [Exhibits 9 and 10].  Thus, the different job titles lend no support to Defendant's position.

Similarly, Tucker himself testified that he was never told the assignment was temporary and believed he had taken over indefinitely. [Exhibit 35 (Tucker Dep. at 106:13-107:4)].  Mr. Tucker was also unable to think of a single job duty held by Mr. Breece that he did not perform after Mr. Breece was placed on leave and then terminated.  [Exhibit 35 (Tucker Dep. at 105:22-106:12)].

Fourth, the only reason Mr. Tucker is not still employed at Lehi is because he quit his employment after an altercation with Robinson which arose out of Tucker's demand for more pay, and ended with Robinson punching Tucker.  [Exhibit 35 (Tucker Dep. 65:4-6); Exhibit 32 (Robinson Dep. 150:6-18); Exhibit 6].  Although Brown had been contacting Lehi for years about potentially returning to work there, it was not until after the fight with Tucker that Robinson phoned Mr. Brown and offered him the position.  [Exhibit 29 (Knight Dep. 38:9-14); Exhibit 26 (Brown Dep. 16:2-10)].  Indeed, during the entire time Mr. Tucker was running the Mill, from March 2003 through October 2003, Defendant did not post the opening or otherwise advertise that there was an opening.  [Exhibit 23 (30b6 Dep. at 142:5-11)].

Thus, there is substantial evidence from which a jury may (a) conclude that Mr. Breece was replaced by Tucker, who was eight years younger than Breece, and (b) disbelieve Defendant's assertion that Breece was not actually replaced until six months after his termination, and only after Tucker quit.  Accordingly, contrary to Defendant's assertions, summary judgment is inappropriate because there is a genuine issue of fact as to whether Breece was replaced by the younger Mr. Tucker, or (as Defendant claims) the older Mr. Brown.

### b. The Fourth Element of the Prima Facie Case Does Not Require Permanent Replacement.

Even if this Court were to determine that Mr. Tucker was merely a "temporary" replacement, courts have held that plaintiffs can meet the fourth element of the prima facie case by comparing the laid-off employee with an employee who was only temporarily assigned to

6

take over the laid-off employee's position.  The Sixth Circuit, for example, has held that the fourth element of the prima facie case in an age discrimination case (*i.e.*, that the plaintiff was replaced by a younger worker) is satisfied "even where the new hire…has the title of 'temporary' employee."  *Tuttle v. Metropolitan Government of Nashville*, 474 F.3d 307, 318 (6th Cir. 2007).  As the Court explained, "merely designating the new hire 'temporary' will not defeat the fourth element" of the prima facie case. *Id.*  Similarly, the Third Circuit has stated that a court is not limited to comparing the plaintiff's age with his final replacement. *Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995). Thus, in *Sempier*, in analyzing whether the plaintiff stated a prima facie case of age discrimination, the Court compared the discharged plaintiff's age with that of an employee to whom some of the plaintiff's job responsibilities were transferred for four months until someone permanently assumed the plaintiff's position.  *Id.*  Other courts have followed suit. *See, e.g., Burtman v. Lance, Inc.*, 2008 WL 718399 (M.D. Pa. March 17, 2008); *Smith v. Page Foam Cushioned Prods. Co.*, 2005 WL 2176841, at *5 (W.D.Pa. Sept.8, 2005) (stating that "the law is clear that even temporary replacement of a worker in the protected class by a person significantly younger is enough to satisfy the undemanding first step of the *McDonnell Douglas/Burdine* analysis").

Similarly, in *Williams v. Ala. Dep't of Transp.*, 509 F.Supp.2d 1046, 1054-55 (M.D. Ala. 2007), a case with facts remarkably similar to the case at bar, the court denied summary judgment finding an issue of fact regarding who was the plaintiff's replacement.  *Id.* at 1055. Defendant had argued that the individual who initially replaced the plaintiff was only a temporary replacement and that it ultimately replaced plaintiff with an individual in the same protected category as the plaintiff. *Id.* at 1054.  The Court found that the question of whether plaintiff was replaced by an individual outside of his protected class was a question of fact that

must be decided by the jury. *Id*. at 1055.  In this case, there are similar issues of fact regarding whether Mr. Tucker or Mr. Brown was Mr. Breece's replacement.  Accordingly, Defendant's motion for summary judgment must be denied.  Permanent replacement is not an element of the prima facie case, and even if it were, there is a question of fact regarding whether Mr. Breece was permanently replaced by a younger individual.

### c.  Mr. Tucker is Sufficiently Younger Than Mr. Breece to Support an Inference of Age Discrimination

Defendant alternatively argues that, even if Mr. Tucker did replace Mr. Breece, he was too close in age to Mr. Breece to support an inference of age discrimination.  Mr. Breece was replaced by Tim Tucker who was eight years younger than Mr. Breece, which Defendant contends is insufficient to meet the fourth prong of the prima facie case.  Defendant contends that any difference in age of less than ten years is not sufficient to meet the fourth prong of the prima facie case.  [Dkt. 75 at p. 5].  Defendant's only support for this proposition is an out-of-circuit case.  *Id*.  The Tenth Circuit, however, has specifically rejected this line of authority and held that the question of whether a replacement is sufficiently younger to support an inference of age discrimination should be left to the jury.  *Whittington v. Nordam Group Inc*., 429 F.3d 986, 996 (10th Cir. 2005).

In *Whittington*, the jury returned a verdict for Plaintiff where the Plaintiff was laid-off and another employee, who was only five years the plaintiff's junior, was retained.  *Id*. at 991, 995.  The employer in *Whittington* argued on appeal that the Tenth Circuit should follow its sister circuits and adopt a bright-line rule that a five year difference in age is insufficient as a matter of law to support an inference of age discrimination and thus the jury's verdict should be overturned.  *Id*. at 994.  The Tenth Circuit declined and held that the question of the difference in age that is sufficient to support an inference of age discrimination should be left to the jury

(subject to reasonable oversight by the District Court). *Id.* at 996.  Accordingly, if the Tenth Circuit has refused to hold that five years is insufficient as a matter of law, this Court cannot grant summary judgment in this case where the difference in age is eight years.  *See, e.g., Friedel v. Mountain View Fire Protection Dist.*, 2008 WL 435280, *3 (D. Colo. Feb 14, 2008).

### C. There is a Genuine Issue of Fact Regarding Whether Mr. Breece was Discriminated Against Because of his Disability

Defendant moves for summary judgment on the EEOC's claim under the Americans with Disabilities Act (ADA) alleging that the EEOC cannot state a prima facie case of discrimination because: (1) Mr. Breece was employed by Defendant for a number of years after Defendant became aware that Mr. Breece had diabetes; (2) Mr. Breece was allegedly replaced by an individual who also has diabetes; and (3) Lehi employed other individuals with diabetes.  None of these facts, even if true, defeat the EEOC's claim of disability discrimination.

#### 1. EEOC Can State a Prima Facie Case of Disability Discrimination

Plaintiff agrees with Defendant that to establish a prima facie case of disability discrimination under the ADA, a plaintiff must demonstrate that (1) he is disabled within meaning of the ADA; (2) he is qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) his employer discriminated against him because of his disability. *Johnson v. Weld County, Colorado*, 594 F.3d 1202, 1217 (10th Cir. 2010). However, the "burden of establishing a prima facie case . . . by a preponderance of the evidence" is "not onerous."  *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 922 (10th Cir. 2001). Furthermore, "[t]his burden is one of production, not persuasion; it can involve no credibility assessment."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (*citing St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

Defendant contends that EEOC cannot raise an issue of fact regarding the causation element of the prima facie case because Mr. Breece remained employed for a number of years after Defendant knew that he had been diagnosed with diabetes.  The EEOC, however, has never alleged or sought to prove the discriminatory motive in this case based on the temporal proximity between the adverse action and learning of the disability.  Temporal proximity is only one of many ways a plaintiff may prove discriminatory motive. In this case, EEOC relies on more direct evidence of discriminatory motive – specifically statements by the Defendant and its lawyers. First, there is evidence from the meeting on March 28, 2003, when Breece was placed on paid administrative leave.  Defendant's own witnesses testify that Mr. Robinson, the President of Lehi Roller Mills, expressly discussed Mr. Breece's diabetes and Robinson's concerns about Mr. Breece's current medical condition.  This fact is reflected in the statement of Mr. Jensen, who was present at the meeting and whose statement Lehi relied upon during the EEOC's investigation of Mr. Breece's charge of discrimination.  Mr. Jensen states as follows:

> On March 28, Sherm [Mr. Robinson] and I met with Alan [Breece] privately in Sherm's office….**Sherm expressed concern over Alan's health and if he were receiving proper medical care, medication, diet and exercise for his diabetes.** Sherm and Alan have been friends for over 20 years and Sherm was genuinely concerned about Alan's health.  Sherm requested that Alan utilize some of the 60 days leave to address some of these issues along with surveying the job market to explore what other opportunities Alan might have.  Alan was to report back in 60 days for a final decision on his employment at the mill.

(Exhibit 5 (emphasis added); Hutchings Dep. at 65:23-66:6).   Mr. Robinson, himself, has confirmed that he made these comments during the meeting when he placed Mr. Breece on leave. [Exhibit 32 (Robinson Dep. at 141:10-13)].  Based on this undisputed evidence of the decision-maker's disability-related comments made during the meeting to relieve Mr. Breece of his duties, a jury may reasonably infer that Mr. Breece was placed on leave due to his disability. Additionally, based on the fact that both Mr. Jensen and Mr. Robinson admit that they told Mr.

Breece to survey the job market, a jury may reasonably infer that Mr. Breece was, in fact, terminated at the March 28 meeting and Defendant never had any intent to bring him back.

Moreover, Defendant's counsel has likewise admitted that Mr. Breece was placed on leave due to his disability.  On March 5, 2009, Defendant filed a motion to dismiss Plaintiff's amended complaint, which stated a sole claim for discrimination based on age.   In its Memorandum of Points and Authorities in Support of its Motion to Dismiss Plaintiff's Amended Complaint [Dkt. 30], Defendant stated as follows:

> Significantly, when Mr. Breece made his administrative charge to the Utah Anti-Discrimination & Labor Division and the EEOC, he claimed that Lehi Roller Mills had discriminated against him not only because of his age, but because of a claimed disability.  Yet nowhere in its allegations does the EEOC suggest that Lehi Roller Mills discriminated against him due to a disability – ***which was the reason for his being placed on paid leave, not his age***.

[Dkt. No. 30 - Memo in Support of Motion to Dismiss at p. 2 n. 2 (emphasis added)].  Thus, Defendant expressly admitted to this court that Mr. Breece was placed on leave because of his disability.  See *Plastic Container Corp. v. Continental Plastics of Oklahoma, Inc*., 607 F.2d 885, 906 (10th Cir.1979*), cert. denied*, 444 U.S. 1018 (1980) (statements in briefs may be considered admissions).

Defendant additionally argues that Plaintiff cannot meet the fourth element of the prima facie case of discrimination because Mr. Breece was ultimately replaced by an individual who has diabetes.  First, even as articulated by Defendant, the prima facie case does not require that Plaintiff prove that he was replaced by an individual without a disability.  Second,, as explained above, EEOC contends that Mr. Breece's replacement was Mr. Tucker, not Mr. Brown.  Mr. Tucker does not have diabetes and is undisputedly not disabled.  [Exhibit 35 (Tucker Dep. at 99:20-22)].  Third, the fact that Mr. Brown may have diabetes does not establish that he is a qualified individual with a disability.  Rather, whether an individual with a particular impairment

has a disability is only determined through an individualized inquiry.  *See, e.g*., 29 C.F.R.Section 1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual").  Here, the evidence establishes that Mr. Brown's diabetes, in contrast with Mr. Breece's diabetes, is controlled.  [Exhibit 24 (Berry Dep. at 87:10-12)].  Indeed, Mr. Brown himself admits that he is not disabled, that he does not have problems with his diabetes and only on rare occasions takes insulin.  [Exhibit 26 (Brown Dep. at 114:15-21; 134:22-24)].  Thus, even if Mr. Breece were replaced by Mr. Brown, he was replaced with a disabled individual.  Second, Thus, Defendant's argument is unsupported by either the facts or the law, and affords no basis for summary judgment.

Defendant's final argument regarding dismissal of Mr. Breece's ADA claim is that Mr. Breece cannot state a prima facie case of disability discrimination because Defendant employed other individuals with diabetes.  The fact that Defendant may or may not have employed other individuals with diabetes is irrelevant for purposes of summary judgment.  *Strickland v. United Parcel Serv*., 555 F.3d 1224, 1230 (10th Cir. 2009) (holding that a jury may infer illegal discrimination in a gender discrimination case notwithstanding the fact that the other female employee suffered no such discrimination).  The EEOC has brought an individual claim for discrimination, alleging that Defendant discriminated against Mr. Breece.  [Dkt. # 52].  The EEOC has not brought a class claim and does not allege that Defendant discriminates against everyone with diabetes.  Accordingly, the EEOC only has to prove that Mr. Breece was discriminated against due to his disability, not that every employee with diabetes was discriminated against.  Indeed, taken to its logical conclusion, Defendant's argument would mean that to bring a race discrimination claim, an African American employee would only

prevail if the employer had an all-white workforce and similarly a female employee could only prevail if she were the only female employee.  Obviously, this is not the case and similarly, the fact that Defendant may employee other employees with diabetes does not defeat Plaintiff's claim for disability discrimination.

### D.  Improper Medical Inquiry

The EEOC has brought a claim alleging that Defendant violated Section 12112(d)(4)(A) of the ADA by repeatedly questioning Mr. Breece about his diabetes.  Beginning in January 2003, Mr. Robinson required Mr. Breece to meet with him on a weekly basis to discuss his diabetes, specifically asking about his sugar levels and whether he had been exercising.  Mr. Robinson admits that he did ask about Breece's health and whether he had exercised.  Mr. Robinson does not deny asking about Breece's blood sugar levels:

> Q.  So the two of you would meet every Tuesday morning at seven a.m., or so?
>
> A.  I don't remember seven a.m., but it could have been.
>
> Q.  And during those meetings did you inquire of Mr. Breece, as you were just testifying, about his diabetes and his blood sugar?
>
> A.  I asked Alan if he had exercised, I asked him where his progress was in discontinuing smoking, discontinuing his use of alcohol.  I don't know that I actually ever inquired what his blood sugar level was.  I do know from his telling me that the purpose of this exercising and that is that it lowered his blood sugar, that simple exercise would really help him.

Exhibit 32 (Robinson Dep. at 143:13-24).

Within three months, Mr. Breece was placed on administrative leave.  During the meeting, while telling Mr. Breece that he was placing him on leave, Mr. Robinson discussed his concerns about Mr. Breece's health and urged him to take care of his medical issues during his leave.

[Exhibit 5; Exhibit 27 (Hutchings Dep. at 65:23-66:6); Exhibit 32 (Robinson Dep. at 141:10-13)].

1.       **The EEOC has Exhausted its Administrative Remedies**

Defendant contends that this Court should dismiss EEOC's medical-inquiry claim on the basis that Mr. Breece did not assert this claim in his Charge of Discrimination.  Defendant's argument fails because the EEOC is not constrained by the contents of an individual's charge of discrimination.

The standards of exhaustion enunciated in Lehi Roller Mills' Brief, while certainly applicable to private plaintiffs, are not the standards of exhaustion applicable to the EEOC. *See, e.g., EEOC v. Caterpillar, Inc.,* 409 F.3d 831, 832-33 (7th Cir. 2005); *E.E.O.C. v. Hearst Corp., Seattle Post-Intelligencer Div.*, 553 F.2d 579, 580-81 (9th Cir.1977); *EEOC v. Outback Steak House*, 520 F.Supp.2d 1250, 1262 (D.Colo. 2007).  Indeed, the law is well-settled that EEOC is "the master of its own case," and "not merely a proxy for the victims of discrimination" or a "vehicle for conducting litigation on the behalf of private parties." *EEOC v. Waffle House, Inc.,* 534 U.S. 279, 288, 291 (2002) (citations omitted).  Thus, EEOC is not limited "to claims typified by those of the charging party." *See General Tel. Co. v. EEOC*, 446 U.S. 318. 331 (1980). Indeed, the Tenth Circuit has specifically held

> The EEOC is not limited to the terms of the charge filed so far as the scope of a s 706 suit it brings upon that charge.  Rather it may sue to vindicate further acts or incidents of discrimination discovered in the process of investigation of the charge filed and reasonably related to that charge, so long as a finding of reasonable cause is made and conciliation is attempted as to the additional acts.

*EEOC v. Continental Oil Company*, 548 F.2d 884 (1977).  *See also*, *Outback Steak House*, 520 F.Supp.2d at 1262 (citing *Caterpillar, Inc.,* 409 F.3d at 833) ("although private litigants are bound in a significant way by the charges they file with the EEOC, a civil enforcement suit by the EEOC is not closely circumscribed by those charges, because the EEOC, after all, is enforcing the broad rights of the public as a whole rather than those of a few individuals").

14

Accordingly, the charge of discrimination is "a jurisdictional springboard" for the EEOC, providing it with a basis to investigate alleged discriminatory practices. *EEOC v. Gen. Elec. Co*., 532 F.2d 359, 364-65 (4th Cir. 1976).  If EEOC uncovers additional violations not identified in the charge, it is "neither obliged to cast a blind eye over such discrimination" nor to initiate a new charge in order to conduct a "repetitive investigation of the same facts already developed in the ongoing investigation." *Id*. at 365.

Thus, the administrative pre-requisites for an EEOC lawsuit are: 1) a charge of discrimination, 2) notice of the charge to the employer, 3) an investigation, 4) a determination of reasonable cause, and 5) an effort to conciliate. *See, e.g., EEOC v. Harvey L. Walner & Assocs.*, 91 F.3d 963, 968 (7th Cir. 1996); *EEOC v. Am. Nat'l Bank*, 652 F.2d 1176, 1185 (4th Cir. 1981) (citations omitted). The purposes of this administrative scheme are to provide notice to employers of the alleged violations and an opportunity to remedy the alleged violations through the conciliation process. *E.g., Am. Nat'l Bank,* 652 F.2d 1176.

Here, Lehi Roller Mills incorrectly relies entirely upon the administrative scheme necessary for the evaluation of individual claims by private litigants and fails to address the unique position of the EEOC.  When analyzed under the proper administrative requirements, EEOC has exhausted the administrative process.   First, Mr. Breece filed a charge of discrimination alleging violations of the ADA.  [Exhibit 4].  Second, the EEOC provided Lehi Roller Mills with notice of the charge. [Exhibit 13].  Third, EEOC conducted an investigation. As part of the investigation, Mr. Breece was interviewed and stated that Mr. Robinson, the president of Lehi Roller Mills, would ask him about his diabetes and how he was doing.  [Exhibit 14].   Additionally, the investigation revealed that another employee confirmed that these improper inquires were made. [Exhibit 15].   EEOC then met the fourth administrative

prerequisite by providing a letter of determination which listed as one of its findings that Respondent continuously asked Mr. Breece about his disability.  [Exhibit 16].  Finally, EEOC provided Lehi Roller Mills with an opportunity to conciliate.  [Exhibit 17].  Thus, EEOC met its administrative burden and Defendant's motion for summary judgment on the basis of subject matter jurisdiction must be denied.

> **2.   Defendant Has Failed to Articulate any Basis for Dismissing EEOC's Medical-Inquiry Claim**

Section 12112(d)(4)(A) of the ADA provide as follows:

> (4) Examination and inquiry
> (A) Prohibited examinations and inquiries
> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C. § 121112(d)(4)(A).   Pursuant to this provision in the ADA, an employer may not make inquiries regarding the nature or severity of an employee's disability unless the inquiries are job-related and consistent with business necessity.  This prohibition applies to all employees, regardless of whether they qualify as "disabled" under the ADA. *Roe v. Cheyenne Mountain Conf. Resort, Inc*., 124 F.3d 1221, 1229 (10th Cir.1997).  Here, Defendant has not argued that Mr. Robinson's inquiries were either job-related or consistent with business necessity.  Rather, Defendant contends that this claim should be dismissed because Mr. Breece voluntarily revealed the fact that he had diabetes and because he allegedly suffered no harm.

Defendant's argument that Mr. Breece voluntarily disclosed his diabetes confuses EEOC's claim alleging improper medical inquiry with a claim alleging improper disclosure. Compare 42 U.S.C. § 121112(d)(4)(C) (information obtained through a confidential medical records or exams must be kept confidential) with  42 U.S.C. § 121112(d)(4)(A)(employers may

not inquire as to an employee's disability unless such inquiry is job-related and consistent with business necessity).   Neither the EEOC nor Mr. Breece has ever alleged that Mr. Robinson or Lehi Roller Mills improperly disclosed the fact that Mr. Breece had diabetes.   Rather, EEOC contends that Mr. Robinson, in his capacity as President of Lehi Roller Mills, improperly regularly made inquiry of Mr. Breece about his diabetes, including asking him on a daily basis about his blood sugar levels, thereby violating the medical-inquiry provision of the ADA.

Defendant's argument that Mr. Breece suffered no harm is without merit.   Here, Mr. Breece suffered a legal and cognizable injury from the illegal inquires.   First, suffering emotional distress is sufficient to state a tangible harm.   *See e.g., EEOC v. Ford Motor Credit Co*., 531 F.Supp.2d 930 (N.D. Tenn. 2008) (holding that Plaintiff's shame, embarrassment and depression caused as a result of a violation of the ADA sufficient to meet "tangible injury" requirement).   Second, Mr. Breece's termination is temporally connected to the illegal inquires.   Mr. Robinson began inquiring as to the status of Mr. Breece's health in early 2003.   Within weeks, Mr. Breece was placed on leave and told to use the time to get his heath issues resolved and look for another job.   [Exhibit 5].   This evidence is sufficient to create an inference that Mr. Breece's termination was a result of the responses he gave to the illegal inquires*.   See e.g., Anderson v. Coors Brewing Co*., 181 F.3d 1171, 1179 (10th Cir.1999) (six-week time period between protected conduct and adverse employment action was sufficient to establish causal nexus.)   And, finally, even if Mr. Breece did not suffer an injury from the illegal inquiry, the EEOC would still be entitled to obtain injunctive relief.   *See e.g., Garrison v. Baker Hughes Oilfield Operations, Inc*., 287 F.3d 955, 961 (10th Cir. 2002).   Accordingly, this Court should not dismiss EEOC's claim for improper medical inquiry on the basis that there is allegedly no cognizable injury.

**E.  There is Significant Evidence of Pretext Warranting Denial of Summary Judgment**

Defendant moves for summary judgment arguing that Plaintiff can not establish evidence of pretext sufficient to survive summary judgment.  EEOC, however, does not have to present any evidence of pretext since there is direct evidence of both age and disability discrimination. *Fischer v. Forestwood Co., Inc*., 525 F.3d 972 (10th Cir. 2008).  Even if Plaintiff were required to prove pretext, however, there is ample evidence of pretext in this case.  The Tenth Circuit has explained that a plaintiff demonstrates pretext by producing evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jaramillo v. Colo. Judicial Dept.*, 427 F.3d 1303, 1308 (10th Cir. 2005), *citing Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997). Pretext may be shown by a variety of evidence and no one type of evidence is required. *Doebele v. Sprint/United Mgt. Co.*, 342 F.3d 1117, 1137 (10th Cir. 2003).  Evidence of pretext may include such evidence as prior treatment of the plaintiff, disturbing procedural irregularities, or the use of subjective criteria.  *Jaramillo,* 427 F.3d at 1308 (*citing Garrett v. Hewlett-Packard Co.,* 305 F.3d 1210, 1217 (10th Cir. 2002)).

In this case, there is an abundance of pretext evidence from which a jury may discredit Defendant's explanations for its actions, and thereby infer discrimination. The pretext evidence includes (1) evidence that Defendant's reason for placing Mr. Breece on leave is unworthy of belief; (2) Defendant changed the requirements for Mr. Breece, setting an unattainable standard; (3) the fact that Defendant keeps changing its position as to the reason for Mr. Breece's termination; (4) evidence of mendacity; and (5) evidence that Defendant's perception of Mr. Breece changed without any explanation

**1.   Defendant's Stated Reasons for Terminating Mr. Breece are Unworthy of Belief**

Defendant alleges that Mr. Breece was placed on leave because the Mill was not meeting a 74% extraction rate, and therefore losing money.  [Dkt. 75 at 19].  Defendant states in its brief that the yield had been 72%, but that it was raised to 74% minimum in late 2002, the same time that it determined that Mr. Breece was not performing adequately.  Defendant further contends that once Mr. Brown was hired, the Mill obtained a 74% yield.  *Id.*

Defendant's position is belied by the facts in this case.  First, the evidence establishes that the minimum extraction rate had always been 72%.   The job description in place in March 2002, for example, indicates that Mr. Breece was required to keep the Mill maintaining a minimum of 72% extraction.  [Exhibit 18].  Likewise, Mr. Robinson, the President and Owner of Lehi, testified in his deposition that the minimum extraction rate in 2003, when Mr. Breece was placed on leave was 72%.  [Exhibit 32 (Robinson Dep. at 149:3-24)].  Lehi's own records demonstrate that the Mill was meeting the 72% extraction rate in March 2003, the very month Mr. Breece was put on leave for failing to meet minimum yield requirements.  [Exhibit 3].  Similarly, Mr. Tucker testified that in January and February 2003, the two months before Breece was put on leave, the mill obtained yields between 72 and 74%.  [Exhibit 35 (Tucker Dep. at 38:13-17)].  Thus, there is evidence that Mr. Breece was indeed meeting his performance goals and Defendant's argument that he was fired for failing to meet the minimum yield is pretextual.

Likewise, Defendant's allegation that under Mr. Brown, the mill returned to meeting the 74% yield requirement is not supported by the record.  In the only document produced during discovery revealing the yields obtained during Mr. Brown's tenure, it is clear that Mr. Brown did not once meet the 74% yield requirement during a seven-month period from July 2005 through

January 2006.[5]  [Exhibit 11].  Indeed, Mr. Brown did not even meet the 72% yield requirement

for three of those months – July, November, and December 2005. *Id.*  Yet, Mr. Brown remained

employed.  Likewise, the head miller who worked under both Mr. Breece and Mr. Brown

testified that the yield continues to sometimes go below 72% and that there is almost no

difference between the yields Lehi obtained under Mr. Breece and Mr. Brown.  [Exhibit 31

(Palomino Dep. at 21:9-14; 22:14-16)].  This is all evidence which may cause a jury to disbelieve

Lehi's claim that Breece was terminated for failure to meet minimum yield requirements.

### 2.  Defendant changed the requirements for Mr. Breece, setting an unattainable standard

In an effort to support its assertion that Mr. Breece was terminated for failing to meet

Defendant's minimum yield requirement, Defendant states that it changed the yield requirement

in late 2002 to increase the requirement from 72% to 74%.  [D's SOF # 42].  At the same time,

Defendant required Mr. Breece to meet a throughput requirement of 3884 cwt/hr (amount of

wheat that is processed per hour, which is recorded as centiweights per hour).  [Exhibit 19;

Exhibit 2, at p. 2].  Defendant's current Plant Manager has testified that these requirements were

impossible to meet with the equipment available at the Mill.  [Exhibit 26 (Brown Dep. 111:20-

112:13)].  Based on this evidence that Defendant increased the yield requirement just months

prior to Mr. Breece's termination, and set a standard for Mr. Breece that cannot be met, a jury

may reasonably infer that the heightened standards were a pretext for illegal discrimination.

### 3.  Defendant's Stated Reasons for Mr. Breece's Termination have Shifted

One time-honored way of establishing pretext is to show the employer's stated reasons

for the adverse employment action have shifted over time.  *See, e.g.*, *EEOC v. Ethan Allen, Inc.*,

---

[5] Defendant has testified that, although it went to great lengths to obtain other documentation of yield, it was unable to locate any other documentation of yield data responsive to the EEOC's requests.  [30b6 Dep. at 63:22-67:25].

44 F.3d 116, 120 (2d Cir. 1994) ("From such discrepancies a reasonable juror could infer that the explanations given by Ethan Allen at trial were pretextual, developed over time to counter the evidence suggesting age discrimination uncovered by the state investigation."); *Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir. 1993) ("In the ordinary case, such fundamentally different justifications for an employer's action . . . give rise to a genuine issue of fact with respect to pretext since they suggest the possibility that . . . the official reasons [were not] the true reasons."); *Zisumbo v. McCleodUSA Telecommunications Services,* 154 Fed. Appx. 715 (10th Cir. 2005) (finding evidence of pretext where employer asserted one reason, than another, and then attempted to rely on both reasons).  Here, Defendant keeps changing its position regarding numerous issues of material fact.

First, Defendant has changed its position about whether Mr. Breece was terminated or voluntarily resigned.  In January 2004, Defendant stated "At the conclusion of the 60 day leave, Alan was dismissed with a severance package."  [Exhibit 12].  In October 2005, Lehi again stated "LRM discharged Breece for a legitimate, non-discriminatory reason." [Exhibit 20]. Similarly, Mr. Jensen, who was the Vice-President of Sales and who was involved in the decisions concerning Mr. Breece, stated in a written statement submitted to the EEOC:  "At the conclusion of the sixty day leave, Alan was dismissed and a severance package was offered and accepted."  [Exhibit 5].  During the litigation of this case, Defendant for the first time alleged that Mr. Breece was not fired, but instead quit his employment. [Dkt. 77 - Robinson Dec. at ¶ 25].

Second, Defendant has changed its position on the reasons for Breece's termination. Defendant now alleges that Mr. Breece was terminated due to his failure to meet the minimum yield requirements.  Previously, however, Defendant has always alleged that Mr. Breece was terminated for failing to meet both the yield and throughput requirements.  [Exhibit 12 and

Exhibit 19].   Indeed, the production meeting minutes state that Mr. Breece must meet at 74% yield and 3884 cwt/hr throughput.   [Exhibit 2 at p.2].   Lehi stopped asserting throughput as a reason for the termination when its own Chief Operations Officer testified in deposition that there was no requirement for throughput.   [Exhibit 29 (Knight Dep. at 88:17-89:2)].

Third, Defendant has changed its position as to whether Mr. Tucker replaced Mr. Breece. In response to the charge of discrimination, Defendant's President, Mr. Robinson, told EEOC without qualification, that Mr. Tucker "performed Mr. Breece's duties." [Exhibit 20; see also Exhibit 23 (30b6 dep. at 118:5-20) (confirming that information contained in letter was correct)]. In his deposition, Mr. Robinson similarly testified without qualification that Mr. Tucker assumed Mr. Breece's duties.  [Exhibit 32 (Robinson Dep. at 81:5-7)].   Now, however, Defendant asserts that Mr. Tucker only assumed a portion of Mr. Breece's job duties (*see e.g.* SOF # 13 and 14, brief at pp.4-5).   And in his declaration attached to its Motion for Summary Judgment, Mr. Robinson has now testified that Mr. Tucker only assumed some of Mr. Breece's duties. [Dkt. 77, Robinson Dec., at ¶¶ 23 and 24].   Based on these numerous changes in Defendant's positions, a jury could find pretext and thus, summary judgment must be denied.

### 4.   Evidence of Untruthfulness

Another method in which Plaintiffs can establish pretext is through evidence of mendacity.  *See, e.g., St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (noting that a "suspicion of mendacity" may be particularly influential to a jury's determination of whether an employer seeks to cover up intentional discrimination).   In this case, there are numerous instances where Defendant's statements have been determined to be untrue.

For example, in response to the EEOC's Interrogatories, Defendant told the EEOC that "[s]hift millers also complained that when they called Mr. Breece to seek information or help, he

was so intoxicated that he was unable to provide the shift millers with help or to answer their questions." [Exhibit 21 at p. 10].   During discovery, however, absolutely no evidence emerged that Mr. Breece's work performance was ever affected by his consumption of alcohol or that any mill employee ever made such a complaint. *See, e.g*., Exhibit 32 (Robinson Dep. at 144:18-145:9); Exhibit 28 (Jensen Dep. at 26:20-23); Exhibit 29 (Knight Dep. at 21:20-22).   Indeed, the shift millers under Mr. Breece all denied making any such complaint.   [Exhibit 30 (Ortega Dep. at 18:16-19:16); Exhibit 35 (Tucker Dep. at 10:15); Exhibit 31 (Palamino Dep at 14:7-18); Exhibit 34 (Spafford Dep. at 144:22-145:10)].

Similarly, in its position statements to the EEOC, Defendant alleged that within a week of Mr. Tucker taking over, the mill returned to its historic levels of production. [Exhibits 12 and 20].   The evidence obtained during discovery, however, revealed that, in fact, the performance of the Mill did not change under Mr. Tucker's tenure.   For example, Mr. Todd Berry, who is part of the management team responsible for the decision to put Mr. Breece on leave, testified that the yields did not increase under Mr. Tucker and that the mill continued to lose money.   [Exhibit 24 (Berry Dep. at 43:25-44:5; 69:20-22; 70:12-14)].   This testimony is supported by the financial records that show that, under Mr. Tucker's tenure, the mill lost significant revenue.   [Exhibit 8].   Similarly, Brock Knight, the COO, testified he was unaware of any differences in production from when Mr. Breece left until Mr. Brown came on.   [Exhibit 29 (Knight Dep. 61:21-25)].   Likewise, the Head Miller, Mr. Palomino, testified that there were no changes made to the mill during Mr. Tucker's tenure.   [Exhibit 31 (Palomino Dep. at 18:8-11)].

Based on this evidence of mendacity, a jury could find that Mr. Breece was placed on leave and terminated due to his age and/or disability.

**5.   Mr. Breece's Termination for Allegedly Poor Performance is in Direct Contrast to Defendant's Perception of Mr. Breece as an Outstanding Employee**

The Tenth Circuit repeatedly has recognized that an employment discrimination plaintiff can defeat summary judgment simply by demonstrating that an evaluation offered to justify a plaintiff's termination conflicts with other assessments of the employee's work performance. *See, e.g.*, *Garrett,* 305 F.3d at 1219; *Greene v. Safeway Stores, Inc.,* 98 F.3d 554, 563-564 (10th Cir.1996) (reversed a directed verdict for the employer because employer's stated reasons were contrary to earlier written and oral specific praise of employee's work in making the division he oversaw profitable and he exceeded performance measures); *Cole v. Ruidoso Mun. Sch.,* 43 F.3d 1373, 1380-1381 (10th Cir. 1994) (reversed the district court because the "glaring contradictions" between the ADEA plaintiff's regular evaluations and the employer's reasons for not renewing the employee's contract demonstrated a genuine issue as to pretext.) In *Garrett,* 305 F.3d at 1219, the Tenth Circuit held that disparities between the plaintiff's earlier performance evaluations and the plaintiff's more recent performance evaluations alone could raise a disputed issue of fact, supporting pretext.

In the instant case, it is undisputed that Mr. Breece worked at Lehi Roller Mills for over 20 years.  [D's SOF # 6].  Mr. Robinson, the President and Owner of Lehi Roller Mills, testified that Mr. Breece was an "outstanding" employee during 20 years of his employment.  [Exhibit 32 (Robinson Dep. at 39:8-12 and 42:18-22)].  It was not until 2002, that Defendant alleges that Mr. Breece's performance allegedly suddenly and precipitously declined.   Notably, this is the same time period in which Defendant increased the yield requirements from 72% to 74% and the same time period when Mr. Robinson began holding weekly meetings with Mr. Breece to inquire about the status of Breece's diabetes.  Thus, under the law in this Circuit, these facts alone are sufficient to preclude summary judgment.

**Conclusion**

This court must deny Defendant's motion in its entirety.  There are numerous statements made by Defendant's management team which are direct evidence that Breece was put on leave and terminated because of his age and/or disability.  In addition, under the *McDonnell/Douglas* burden-shifting analysis, there is ample circumstantial evidence to support an inference of discrimination.  In particular, Defendant's false statements to the EEOC are precisely the kind of mendacity evidence referred to by the Supreme Court in *St. Mary's Honors Center*.  Additionally, Defendant's changing explanations for its actions, its untimely heightened and unreasonable production standards, and its assertion of a dramatic change in performance contrary to 20 years of prior outstanding performance, are all evidence of pretext which preclude entry of summary judgment.  Finally, Plaintiff has raised a material issue of fact regarding whether Defendant violated section 12112(d)(4)A) when it repeatedly inquired about Mr. Breece's diabetes and whether those illegal inquiries led to Mr. Breece's termination.

DATED this 27th day of June, 2011.

Respectfully submitted,

Equal Employment Opportunity Commission

s/ *Stephanie Struble*_____
Stephanie Struble
Senior Trial Attorney

**CETIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on this 27th day of June 2011, I electronically filed the foregoing **RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:
Sterling Arthur Brennan, SBrennan@wnlaw.com
Rex Sears, rsears@wnlaw.com
Cara Baldwin, cbaldwin@wnlaw.com

s/ *Stephanie Struble*_____